RICHMOND CONSTRUCTION CORP.,
Glenroe, Inc., Homes for Living, Inc.,
Homes by Richmond, Inc., and Kimbuff,
Inc., Plaintiffs,

v.

Francis HILB et al., Defendants.

No. 77–175 Civ. T–K.

United States District Court,
M. D. Florida,
Tampa Division.

Jan. 22, 1980.

Henry P. Trawick, Jr., Sarasota, Fla., for plaintiffs.

Malcolm V. McKay, of Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., for defendants.

Charles D. Bailey, Jr., of Williams, Parker, Harrison, Dietz & Getzen, Sarasota, Fla., for Ellis Sarasota Bank & Trust Co.

## ORDER

KRENTZMAN, District Judge.

This removed diversity case is before the Court upon plaintiffs' motion to remand. The parties have filed several sets of memoranda in support of their respective positions.

Plaintiffs ("the Richmond group") are Florida corporations involved in real estate development. Defendant Ellis Sarasota Bank and Trust Company ("Ellis") is a Florida banking corporation which, among other things, holds title to a tract of real property as trustee for some of the parties. Defendant Four Seasons Hotels, Ltd. ("Four Seasons") is a Canadian corporation which existed and operated prior to the events alleged in the complaint. Defendants Hilb, Iamarino, Levy, Sharpe, and Eisen ("the Canadian individuals") are Canadian individuals who are involved in real estate investments on behalf of themselves, members of their families, and possibly others. The remaining thirty-three defendants are Canadian corporations ("the venture corporations") owned by various combinations of Four Seasons, the Canadian individuals, and the investors the Canadian individuals represent.

The venture corporations were either created for or initially utilized in joint ventures with the Richmond group in Florida real estate. These joint ventures concerned four projects on separate tracts of land:

Racimo, Punta Gorda, New Approach, and Hidden Gardens.

Although separate joint venture agreements were executed for each project, the complaint alleges that the parties agreed to share profits and losses collectively, for all the ventures. It is further alleged that the Canadian investors breached this agreement by failing to pay their share of the expenses in the Hidden Gardens and New Approach projects when it became apparent that these projects would be unprofitable.

■ The motion to remand asserts that at least some of the venture corporations have their principal places of business in Florida and that they are Florida citizens under 28 U.S.C. § 1332(c). Alternatively, plaintiffs assert that Ellis is a Florida citizen and a necessary party. If either set of assertions is true, the case must be remanded for lack of diversity (or other) jurisdiction. Defendants, who petitioned for removal, have the burden of showing that the Court has jurisdiction. *Smith v. City of Jackson*, 358 F.2d 705 (5th Cir. 1966).

Section 1332(c) provides as follows:

For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . .

The Courts have divided on the applicability of this subsection to corporations incorporated outside the United States, such as the venture corporations. No precedents bind this Court. The only appellate case discussing the question, *Clarkson Co. v. Shaheen*, 544 F.2d 624 (2d Cir. 1976), does so as dicta, in a footnote.

The lines of cases refusing to apply § 1332(c) to alien corporations begins with *Eisenberg v. Commercial Union Assurance Co.*, 189 F.Supp. 500 (S.D.N.Y.1960). Judge Dimock's opinion notes that the statute uses "State" to refer to one of the United States and "state" to refer to a foreign country. Thus, "a corporation shall be deemed a citizen of any State by which it has been incorporated" can only apply to a corpora-

tion incorporated in one of the United States. From this, Judge Dimock concluded that "the State where it has its principal place of business" also only applies to American corporations. This reasoning was not required for the ruling in that case, because Judge Dimock found that the corporation's principal place of business was not in any "State."

The *Eisenberg* opinion has been cited in other cases arising in the Southern District of New York, usually in dicta (e. g., *Clarkson Co., supra*), but also in cases which turn on this point (e. g., *Chemical Transportation Corp. v. Metropolitan Petroleum Corp.*, 246 F.Supp. 563 (1964).

The leading case for the view that § 1332(c) does apply to alien corporations is *Southeast Guaranty Trust Co. v. Rodman & Renshaw, Inc.*, 358 F.Supp. 1001 (N.D.Ill. 1973). Judge Will analyzed the *Eisenberg* reasoning and the Congressional intent in enacting § 1332(c), as follows:

There are many instances in which the second half of § 1332(c) does not apply to United States corporations, i. e., where a corporation maintains its principal place of business in the same state in which it is incorporated. Since it makes no sense at all for a corporation to be twice a citizen of the same state, there must be read at the end of the section, "if the State of its principal place of business is different from the State of its incorporation." Similarly, we see no ground for concluding that because the first half of the section does not apply to foreign [alien] corporations, that the second half should have no application to them at all. It seems no greater extension of the language to read in, when dealing with foreign corporations, "if its principal place of business is in the United States." Obviously Congress would only use the word State with a capital S, since if a corporation's principal place of business was in a foreign state it would have no effect whatsoever on its citizenship for diversity purposes in the courts of the United States.

While it is true that Congress apparently gave no explicit consideration to the effect of the amendment on alien corporations, our interpretation of its applicability better serves the express Congressional purpose of the amendment which was to limit the diversity jurisdiction of the federal courts. By enacting § 1332(c), Congress sought to preclude any technical finding of diversity, when, in fact, no diversity existed. When a corporation, while incorporated in another state, maintained its principal place of business in the same state in which its legal adversary was a citizen, it was felt neither to need nor deserve the protection of a federal court from any possible state court bias against an outsider. This rationale is no less compelling when applied to a corporation which has been chartered in a foreign country but maintains its principal place of business in the United States. . . .

This analysis accurately reflects the legislative history. *See,* Sen.Rep. No. 1830, 85th Cong., 2d Sess., to accompany H.R.11102, 2 U.S.Code Cong. & Admin.News 1958, p. 3099 et seq. Applying § 1332(c) to alien corporations would further both the overall purpose of the bill (reduction of district court caseload pp. 3100–01) and the specific purpose of the amendments to § 1332 (eliminating the unfair advantage given the actually-local, but fictionally-foreign corporation, pp. 3119–20).

Judge Will's viewpoint is the same as that taken by the American Law Institute. *Study of the Division of Jurisdiction Between State and Federal Courts, Official Draft,* 1969, § 1301(b)(1). The view has also found favor with the commentators. 1 *Moore's Federal Practice* ¶ 0.75[3] (1972); 13 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3628 (1975).

Perhaps more importantly, this view has now been taken by one court in the Southern District of New York, the District in which *Eisenberg* was decided. *Bergen Shipping Co. v. Japan Marine Services, Ltd.,* 386 F.Supp. 430 (1974, J. Conner). *See also, Arab Int'l Bank & Trust Co., Ltd. v. Nat'l*

*Westminister Bank Ltd.,* 463 F.Supp. 1145 (S.D.N.Y.1979).

After examination of all of the above-cited cases and authorities, as well as others cited by counsel, this Court finds Judge Will's reasoning to be persuasive. Title 28 U.S.C. § 1332(c) does apply to alien corporations.

The United States Court of Appeals for the Fifth Circuit has indicated that a corporation's principal place of business should be determined by an examination of the total activity of the corporation. *Anniston Soil Pipe Co. v. Central Foundry Co.,* 216 F.Supp. 473 (N.D.Ala.1963), *aff'd,* 329 F.2d 313 (5th Cir. 1964); *American Foundation, Inc. v. Mountain Lake Corp.,* 454 F.2d 200 (5th Cir. 1972).

At hearing, the parties agreed that the Court should consider the deposition of Lionel Sharpe, the affidavits of Lionel Sharpe and Jack C. Betz, the joint venture agreements, and the land trust agreement. The Court has read and considered each of these documents.

Each venture corporation is incorporated in Toronto, Ontario, Canada and is qualified to do business in the state of Florida. None of these corporations is qualified to do business in any other state or country.

The officers and directors of the venture corporations are all Canadian citizens. The shareholders are Canadian citizens and corporations incorporated in Canada.

The venture corporations have not paid any salary, compensation, or reimbursement of expenses to their officers and directors. No distributions of income or assets have been made to the shareholders.

The venture corporations have no employees in Canada other than the officers and directors. They use the offices of Four Seasons Realty Group in Toronto. Other than the officers and directors, the tangible embodiment of each venture corporation, in Canada, is a bank account containing three of four dollars and a set of financial sheets.

Both in Toronto and in Florida, the venture corporations employ external, local accountants to prepare income tax returns.

Some meetings of shareholders and of boards of directors of the venture corporations have been held in Toronto.

Each of the venture corporations owned an interest in one or more of the four joint ventures. Bridgehurst Holdings (Sarasota), Inc., Neasden Holdings (Sarasota), Inc., Renhill Home Builders (Sarasota), Inc., Emile Holdings (Sarasota), Inc., Mandolin Investments (Sarasota), Inc., Sunflower Holdings (Number 3), Inc., American Botany Holdings (Number 3), Inc., Netjac Corporation (Sarasota), Inc., and 279389 Ontario, Inc. each currently own interests in both the Racimo and Punta Gorda joint ventures. Each of these corporations also owns interests in three apartment buildings in North Miami Beach, Florida: Riviera Isles, Canusa Isles, and Florence Apartments.

The title to the Racimo property is held by Ellis, on behalf of the joint venturers.

Riviera Isles contains 28 "suites" or apartments. Title to this building is held by Francis Hilb and Sigmond Levy in trust. The Second National Bank of Miami Beach, Florida holds a purchase money mortgage on this property.

Canusa Isles contains 16 suites. Title to this building is held by Canusa Isles, Inc., which is incorporated in Florida. Washington Federal Savings and Loan Association of Miami, Florida holds a purchase money mortgage on this property.

Florence Apartments contains 29 suites. Title to this building is held by Arthur Iamarino as trustee. Greater Miami Federal Savings and Loan Association holds a purchase money mortgage on this property.

Each apartment building is managed by an American citizen who resides in the building. Each manager is compensated by rent reduction and/or salary. Each apartment building maintains a local (Miami) checking account for deposit of rent receipts. The checkbooks are kept in Toronto and bills are paid by checks written in Toronto on the Miami banks.

The minute books for Canusa Isles, Inc. are in the possession of Eugene Fiero, a Miami attorney. The ledgers for the apartments are in Toronto.

The Richmond group had originally handled the on-site and Florida aspects of the developments, including obtaining necessary governmental approval. The Richmond group did not proceed as expeditiously as the Canadians desired. In August, 1974, Francis Hilb and Lionel Sharpe traveled to Florida and hired Malcolm V. McKay, of the Tampa law firm of Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, and Johnson S. Savary, of the Sarasota law firm of Kirk, Pinkerton, Sparrow, McClelland & Savary, to register the Racimo project with the Florida Land Sales Board and to obtain other necessary approvals. Hilb, Sharpe, McKay and Savary were acting on behalf of all of the interested Canadian parties in these matters, including the nine corporations listed above.

Initial zoning and permits had been obtained for the Racimo project in early 1974. These had two year terms and would expire if grading, paving, drainage, and other work was not begun either in February, 1976 or immediately thereafter. Loss of zoning would delay and possibly prevent completion of the project. Additionally, stricter county subdivision regulations had been passed since 1974, so that proceeding under new authority would be approximately 25% more expensive—an increase of over $100,000 in costs.

Faced with this situation, J. V. Mosby, the project engineer, contacted the Richmond group, which had employed his firm and which was supervising the Racimo project. The Richmond group was willing to begin only token work, which Mosby felt would not save the zoning. Because the Canadians owned 90% of the Racimo project, Mosby's office telephoned them and informed them of the impending problems.

The Canadians directed Mosby's office to get estimates for the necessary work. Shortly thereafter, Hilb came to Florida and negotiated a contract with Mosby Engineering Associates, Inc. to complete the engineering work on the Racimo project for approximately $33,000. Hilb contracted in the name of Calix Holdings, Inc., a Canadi-

an corporation used as a financial conduit or "private bank" by the principals behind the venture corporations. At about the same time, Calix entered into two contracts with West Florida Paving, Inc., for the paving and grading work at Racimo. These contracts provided for a total payment of approximately $374,000. As of February, 1976, Mosby Engineering Associates and West Florida Paving were acting as agents and/or employees of the interested Canadians, parties including the nine venture corporations previously listed.

As relations between the Richmond group and the Canadians deteriorated, the Canadians took increasing control of and responsibility for the Racimo project. They arranged for sale of units in the Racimo project through a Sarasota real estate brokerage firm, Michael Saunders & Co. They obtained a mortgage through Ellis of approximately $400,000 to cover the costs of the paving, grading, and engineering work. As mentioned before, they hired attorneys to obtain permission from the state of Florida to sell the units.

Hilb traveled to Florida approximately once a month from February, 1976 until the completion of the Racimo work, and several times prior to that. Sharpe, Levy, and Eisen came to Florida some lesser number of times. Despite the convoluted corporate structures created by the Canadian investors, it is clear that, in each of these trips and in all of their dealings relating to the Racimo project, these individuals acted on behalf of the nine venture corporations listed above, as well as on behalf of other interests.

The Court is aware that substantial portions of defendants' Florida activities were "thrust upon them" by plaintiffs' unwillingness or inability to satisfactorily fulfill their responsibilities. This does not, however, lessen the quantity or quality of defendants' activities in the state of Florida.

Upon examination of the total activities of Bridgehurst Holdings (Sarasota), Inc., Neasden Holdings (Sarasota), Inc., Renhill Home Builders (Sarasota), Inc., Emile Holdings (Sarasota), Inc., Mandolin Investments (Sarasota), Inc., Sunflower Hold-

ings (Number 3), Inc., American Botany Holdings (Number 3), Inc., Netjac Corporation (Sarasota), Inc., and 279389 Ontario, Inc., the Court finds that each of these corporate defendants has its principal place of business in the state of Florida. Accordingly, these defendants are Florida citizens for the purposes of diversity. 28 U.S.C. § 1332(c). This finding eliminates the need to consider the other questions raised by the motion to remand.

Since some defendants are Florida citizens and all plaintiffs are Florida citizens, this Court has no diversity (or other) jurisdiction over this case. This case was improvidently removed. Plaintiffs' motion to remand is GRANTED. 28 U.S.C. § 1447(c).

It is ORDERED that this case be REMANDED to the Circuit Court for the Twelfth Judicial Circuit, in and for Sarasota County, Florida, for all further purposes. The Clerk of this Court is directed to prepare a certified copy of this order and to send it to the Clerk of that Court, together with the depositions and other matters in the discovery file.

IT IS SO ORDERED at Tampa, Florida this 22 day of January, 1980.